## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| PATRICK WILLIAMS, | ) | CASE NO. 1:16-cv-2676 |
| | ) | |
| Petitioner, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| TOM SCHWEITZER, Warden | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |

This matter has been referred to the undersigned United States Magistrate Judge for preparation of a Report and Recommendation pursuant to Local Rule 72.2(b)(2).  Before the Court is the Petition of Patrick Williams ("Williams" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254.  Williams is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to journal entry of sentence in the case *State v. Williams*, Cuyahoga County Court of Common Pleas Case No. 07-494311-A.

Before the Court is Respondent Tom Schweitzer, Warden of the Lebanon Correctional Institution's Motion to Dismiss the Petition as Time-Barred.  (Doc No. 7.)  For the reasons that follow, it is recommended that Respondent's Motion be GRANTED and the Petition be DISMISSED as time-barred.

### I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct unless rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695

F.3d 439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The

state appellate court summarized the facts underlying Williams's conviction as follows:

> {¶ 7} The grand jury indicted Williams on five counts: count one, aggravated murder, in violation of R.C. 2903.01(A); count two, murder, in violation of R.C. 2903.02(B); count three, felonious assault, in violation of R.C. 2903.11(A)(2); count four, felonious assault, in violation of R.C. 2903.11(A)(1); and count five, felonious assault, in violation of R.C. 2903.11(A)(2).  All counts contained one- and three-year firearm specifications.  A jury trial commenced, and the following evidence was presented.

> {¶ 8} Erika Wright testified that in December 2006, when the events occurred, she was living with her mother, Karen Wright, and her sister, Khristine Wright, in Arbor Park Village located at East 40th Street and Woodland Avenue.  The victim, Tynell Anderson (whose nickname was "Boo Nell"), was her boyfriend at that time and the father of one of her children.  They had been dating for eight years when he was murdered, although they had broken up many times during that period.

> {¶ 9} Erika stated that she had recently been released from Marysville prison after being convicted of theft.  She also had prior convictions of drug trafficking and automobile theft.  Tynell was her codefendant in the automobile theft case.  She also explained that Tynell had been convicted of drug trafficking and robbery.

> {¶ 10} During one of the times when Erika and Tynell had broken up, Tynell dated Marteese Williams for a couple of months.  Marteese also lived at Arbor Park, right around the corner from Erika's mother's.  Erika socialized with Marteese and her family during the summer of 2006, including Marteese's mother, Valencia Williams, and her brother, Patrick Williams (the appellant), whose nickname was "P.J."  Erika stated that she had been to Marteese's house on several occasions.  But by December 2006, Erika was dating Tynell again, so her relationship with Marteese had deteriorated.

> {¶ 11} On the evening of December 30, 2006, Erika and Tynell walked to Dave's Supermarket at East 40th Street and Quincy Avenue.  On the way there, they saw Marteese walking across the parking lot.  Erika and Tynell began arguing loudly about Marteese.  Marteese overheard them and "jumped into the conversation."  Erika and Marteese continued to exchange words the rest of the way to the grocery store.

> {¶ 12} When they arrived at Dave's Supermarket, Erika said that Marteese spit in her face, and in response she hit Marteese, and a fight ensued.  Tynell tried to break up the fight, but Erika stated that a Cleveland police officer broke up the

2

fight.  Marteese left the store immediately.  Erika and Tynell shopped for five or ten minutes, and then walked back to Erika's mom's house, which took another five or ten minutes.

{¶ 13} Approximately ten minutes after they got back, the doorbell rang.  Erika went to the intercom and asked who it was.  She heard a male say, "is Erika there?"  She said "no" because she was not expecting anyone, and she did not recognize the male's voice.  She walked to the window, looked outside, and saw Valencia screaming and yelling "up at the window" (they lived on the second floor).  Erika said she walked downstairs to talk to Valencia.  When she got outside, Valencia began yelling at her.  When this occurred, Erika said that it was evening and not "real bright outside," but it "was still light time outside."

{¶ 14} Erika testified that she was trying to talk to Valencia when she noticed a two-door, dark green car parked on the street.  She said that she was not "really too good with cars," but that it looked "like a Grand Am."  She explained that the yard was small, so the car was "real close."  She could see that Marteese was in the driver's seat.  As soon as she saw the car, she noticed Williams "getting into the back seat" of the vehicle.  She said, "but I guess once he heard me and his mom arguing * * * he got back out of the car" and "started walking towards the door."  Williams was wearing "a gray hoodie," which was "over his face," but Erika said that she knew who he was "even still with the hoodie on."  She still knew who he was because "I know what he looked like and he was coming towards me."

{¶ 15} Erika testified that as Williams walked past her, she asked him, "why you all coming up here?"  Williams replied, "fuck that, where is that whole ass nigger, Boo Nell at?"  As soon as he walked past her, and when her back was to him, Erika heard the first gunshot.  She turned around and saw "P.J. walking behind Tynell shooting the gun."  She said that Williams had a black handgun and was walking "right behind" Tynell shooting it at him.  At that time, she saw Tynell running back into the house.  She also saw that her mother and her sister had come outside.  Her mother followed Tynell back into the house.  Erika said that she heard "about five shots" fired.  After he was done shooting, Erika saw Williams run back to the car.

{¶ 16} Erika further testified that after the shooting, she ran into the house and saw that Tynell had been shot.  She said that her mother had already called 9-1-1, but she called too because she thought it was taking too long for someone to come.  The 9-1-1 tape was then played for the jury.  Although the whole tape is not comprehendible because there is a lot of yelling, it is clear that the dispatcher asked Erika who shot Tynell.  Erika said that she was the one on the tape who told the dispatcher that it was a man named "P.J."

3

{¶ 17} On cross-examination, Erika said that she knew Williams, but did not know him well enough to recognize his voice on the intercom.  She said that Marteese had a white car, but on that night she was driving a green car.

{¶ 18} Erika's mother, Karen, testified next.  Karen explained that after Erika and Tynell came back from the store, the doorbell rang.  Erika went downstairs (i.e., outside) and Karen could hear her arguing with a woman.  Karen said that she went downstairs because she does not like "confusion in front of my door."  She saw a woman yelling at Erika and she saw a car in the street.  Karen said that she tried to tell the woman, "talk to me, I'm her mother."  But then she saw a man coming up on her left and she heard him say, "[h]ey, man, I heard you was around here fucking with my sister."  Karen looked and saw that the man had a black gun that was "in her face."  She said that he was holding the gun to the side, like a "[g]angster."  He fired the gun and it was so close to her that she "saw the fire come out of it" and "smelled the stinky oily smell."  She said that she ran behind her van, but she could see Tynell running from the shooter, back toward her house.  She heard five or six shots, not random, but "like [the shooter] was trying to hit a moving target."  But the shooter himself was not moving; "he was stationary.  He stood still."

{¶ 19} Karen explained that the woman who had been yelling at Erika got into the four-door vehicle that was parked in front of her house.  The shooter took off running down the street.

{¶ 20} Karen testified that when the shooting occurred, the street lights were on because it was dark outside.  She saw that the shooter was a dark-skinned African American, but she did not get a good look at him because "there was a pistol in [her] face."

{¶ 21} Khristine testified next.  She corroborated Erika's and Karen's version of the events, except for the following differences.  She said that she "knew of" Marteese and Williams, but did not know them personally.  She said that she went to the window with Erika and saw Valencia, whom she had never seen before that day, and Williams standing outside their door, and she saw Marteese sitting in a car.  She said her mother went outside first, followed by her and Erika.  She saw Williams in front of their door as soon as she went outside.  She could not remember what he was wearing, but thought that he was wearing a "hoodie."

{¶ 22} Khristine said that after a couple of minutes, Tynell came out of the house.  At that time, she saw Williams pull out a black gun "from somewhere off his body" and start shooting.  She heard Williams say, as he was pulling the gun out, "something about his sister, referring to what happened at the grocery store."  Khristine saw the first shot and then took off running down the street.  She did not run far.  She turned around and saw Tynell run into the house and saw Williams

4

shooting into the doorway of the house.  She did not see where Williams or his mother went after the shooting.

{¶ 23} Cleveland Police Officer Patrick McLain testified that on the night of the shooting, he was working with his partner, Angel Sarra, on routine patrol.  They received a call around 6:15 p.m. "for a male shot."  They found a bullet on the ground and one in the front doorframe.  There was also a bullet slug at the bottom of the doorframe.  Officer McLain testified that they received the name of a suspect that evening and began searching for him, but they were not able to locate him that evening.

{¶ 24} Detective Tim Entenok testified that he arrived at MetroHealth on the night of the incident.  By the time he and his partner arrived, Tynell had already been pronounced dead.  He interviewed Erika at the hospital.  She gave them Williams' name and later identified Williams in a photo array.  He said they obtained written statements from Erika, Karen, and Khristine approximately three days after the incident.  Karen was not able to identify Williams in a photo array.  Detective Entenok testified that the firearm was never recovered.

{¶ 25} On cross-examination, Detective Entenok testified that Erika described the "getaway vehicle" to him as a green Pontiac or Trans Am.  He said they searched police database listings as to whether Marteese owned such a car.  They found that Marteese Williams owned a 1995 Pontiac, four-door Grand Prix.  An official document from the Bureau of Motor Vehicles, however, indicated that this vehicle was impounded on November 20, 2006 and "junked" on January 24, 2007.

{¶ 26} At the close of the state's case-in-chief, Williams moved for a Crim.R. 29 acquittal.  The trial court granted it as to count five, but denied it as to the remaining counts.

{¶ 27} The jury found Williams guilty of counts one through four, aggravated murder, murder, and two counts of felonious assault, and all of the firearm specifications.  The trial court merged the firearm specifications for purposes of sentencing.  It then imposed three years in prison for the merged firearm specifications and ordered that they be served consecutive to and prior to all other counts.  The trial court then sentenced Williams to life in prison with parole eligibility after twenty years on count one, aggravated murder; fifteen years to life in prison on count two, murder; seven years on both felonious assault convictions, counts three and four; ordered that counts one through four be served concurrent to one another; and advised Williams that he would be subject to five years of postrelease control upon his release from prison.

*State v. Williams*, 2009 WL 1156678 at * 1-5 (Ohio App. 8th Dist. April 30, 2009).

**II. Procedural History**

**A.      Trial Court Proceedings**

On March 3, 2007, a Cuyahoga County Grand Jury charged Williams with one count of aggravated murder in violation of Ohio Revised Code ("O.R.C.") § 2903.01(A) (Count One); one count of murder in violation of O.R.C. 2903.02(B) (Count Two); two counts of felonious assault in violation of O.R.C. 2903.11(A)(2) (Counts Three and Five); and one count of felonious assault in violation of O.R.C. § 2903.11(A)(1) (Count Four).  (Doc. No. 7-1, Exh. 1.) Each of these Counts also included one and three year firearm specifications pursuant to O.R.C. §§ 2941.141 and 2941.145.  (*Id.*) Williams was appointed counsel and pled not guilty.  (Doc. No. 7-1, Exhs. 2, 25.)

The case proceeded to a jury trial on October 29, 2007.  (Doc. No. 7-1, Exh. 25.) Pursuant to Williams' motion for acquittal under Ohio Crim. R. 29, the state trial court granted Williams's motion to dismiss one count of felonious assault in violation of O.R.C. § 2903.11(A)(2) with two firearm specifications as set forth in Count Five of the indictment. (Doc. No. 7-1, Exh. 3.)  The jury returned a verdict of guilty as charged on all other counts. (Doc. No. 7-1, Exh. 3.)

On November 30, 2007, the trial court sentenced Williams to 20 years to life on Count One (aggravated murder), 15 years to life on Count Two (murder), and seven years each on Counts Three and Four (felonious assault).  The trial court merged the firearm specifications, imposed three years in prison for the merged specifications, and ordered them to run prior to and consecutive with all other counts.  The trial court further ordered that Counts One through

6

Four be served concurrent to one another, for an aggregate prison term of twenty-three (23)

years.  (Doc. No. 7-1, Exh. 4.)  Williams was advised of his appeal rights.  (*Id.*)

**B.     Direct Appeal**

On December 28, 2007, Williams, through new counsel, filed a Notice of Appeal with

the Court of Appeals for the Eighth Appellate District ("state appellate court").  (Doc. No. 7-1,

Exh. 5.)  In his appellate brief, Williams raised the following assignments of error:

> I.      THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO
>         SUPPORT A FINDING BEYOND A REASONABLE DOUBT THAT
>         THE APPELLANT WAS GUILTY OF AGGRAVATED MURDER,
>         MURDER, AND FELONIOUS ASSAULT
>
> II.     APPELLANT'S CONVICTIONS FOR AGGRAVATED MURDER,
>         MURDER AND FELONIOUS ASSAULT WERE AGAINST THE
>         MANIFEST WEIGHT OF THE EVIDENCE
>
> III.    THE TRIAL COURT ABUSED ITS DISCRETION BY GIVING THE
>         JURY A FLIGHT INSTRUCTION
>
> IV.     APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE
>         ASSISTANCE OF COUNSEL GUARANTEED BY ARTICLE I,
>         SECTION 10 OF THE OHIO CONSTITUTION AND THE SIXTH
>         AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
>         CONSTITUTION WHEN TRIAL COUNSEL FAILED TO
>         SUBPOENA AN ALIBI WITNESS AND FAILED TO QUESTION OR
>         OTHERWISE CHALLENGE JUROR No. 11, MR. KLAMERT,
>         DURING THE VOIR DIRE STAGE OF THE TRIAL.

(Doc. No. 7-1, Exh. 6.)

Via decision released on April 30, 2009 and journalized on May 11, 2009, the state

appellate court affirmed Williams's conviction.  (Doc. No. 7-1, Exh. 8.)  *See also State v.*

*Williams*, 2009 WL 1156678 (Ohio App. 8th Dist. April 30, 2009).  Williams did not timely

appeal the decision to the Ohio Supreme Court.

7

### C.    Post-Conviction Motions regarding Fines and Costs

Over four years later, on June 6, 2013, Williams filed a *pro se* "Motion to Stay the Imposition of Restitution, Fines, and/or Court Costs" in state trial court.  (Doc. No. 7-1, Exh. 9.) On that same date, he also filed a *pro se* "Motion to Vacate Fines and Court Costs or to Allow Defendant to Pay Stated Obligation in Installments."  (Doc. No. 7-1, Exh. 10.)

On September 5, 2013, the trial court denied Williams's Motion to Vacate Fines and Costs as moot on the grounds he had previously been declared indigent and all financial obligations were waived as of May 6, 2008.  (Doc. No. 7-1, Exh. 11.)  Williams did not appeal the trial court's order.

### D.    Delayed Application to Reopen Appeal Pursuant to Ohio App. R. 26(B)

On May 29, 2014, Williams, through new counsel, filed a motion for leave to re-open his direct appeal pursuant to Ohio App. R. 26(B).  (Doc. No. 7-1, Exh. 12.)  In his motion, Williams acknowledged his 26(B) motion was untimely but maintained there was good cause for the delay, arguing as follows:

> Appellant has been imprisoned continuously since February 22, 2007.  Since that time he has had no personal contact with his appointed appellate lawyer. Although a notice of appeal and merit brief were filed on his behalf, he was not given copies of same, nor copies of the State's reply brief.
>
> Appellant 's appeal was denied on April 30, 2009.  However, Appellant was never notified by his appellate lawyer that the appeal had been denied, and was not given a copy of the decision.  Appellant did not know the basis for the denial, nor was he aware of what assignment of errors that were raised.  Further, his appellate lawyer never advised him of the option of appealing to the Ohio Supreme Court or moving to re-open the appeal pursuant to Rule 26(B).  In short, not being a lawyer himself, being only 17 years old at the time of the trial, Appellant relied upon his appellate lawyer to his detriment to raise all issues - yet this did not occur.

8

It was only when Appellant consulted current counsel, that he learned of the ability to move to re-open his appeal.  Unfortunately, by this time the 90 day period to re-open had passed.

(Doc. No. 7-1, Exh. 12 at Page ID# 161-162.)  Williams then argued his appellate counsel was

deficient for the following reasons:

> I.      Appellate counsel failed to raise the issue of ineffective assistance of trial counsel in failing to move for a mistrial based upon the State's improper attack on Appellant's alibi.
>
> II.     Appellate counsel failed to raise the issue of ineffective assistance of trial counsel for failing to file an [sic] litigate a motion to suppress identification evidence.
>
> III.   Appellate counsel failed to raise the issue of prosecutorial misconduct which prejudiced Appellant's right to a fair trial.

(Doc. No. 7-1, Exh. 12.)  The State filed a Brief in Opposition on July 22, 2014.  (Doc. No. 7-1,

Exh. 13.)  Two days later, on July 24, 2014, Williams filed a "Motion for Leave to File a Sworn

Statement," which was granted.  (Doc. No. 7-1, Exhs. 14, 16.)  Williams filed his Sworn

Statement as a supplement to his Motion for Leave to Reopen Appeal.  (Doc. No. 7-1, Exh. 15.)

On September 23, 2014, the state appellate court denied Williams's application to re-

open the appeal.  (Doc. No. 7-1, Exh. 17.)  The state appellate court determined Williams filed

his application for reopening well outside the time limits of Ohio App. R. 26(B)(1), and failed

to establish good cause for filing at a later date.  (*Id.*)

On October 30, 2014, Williams, through counsel, filed a Notice of Appeal to the

Supreme Court of Ohio.  (Doc. 7-1, Exh. 18.)  In his Memorandum in Support of Jurisdiction,

Williams raised the following Propositions of Law:

> I.      In a motion to re-open appeal, where the applicant demonstrates good cause for late filing, due to tender age, no legal training, no contact with appellate counsel, detrimental reliance upon appellate counsel; and the

recent hiring of new counsel, re-opening should be granted by the lower court.

II.     An accused is entitled to effective assistance of appellate counsel in order to raise a *specific* assignment of error relating to ineffective assistance of trial counsel in failing to move for a mistrial.

III.    An accused is entitled to effective assistance of appellate counsel, in order to raise a *specific* assignment of error relating to ineffective assistance of trial counsel in failing to litigate a motion to suppress identification evidence.

IV.     An accused is entitled to effective assistance of appellate counsel in order to raise the issue of prosecutorial misconduct, that is supported by the record.

(Doc. No. 7-1, Exh. 19) (emphasis in original).

On January 28, 2015, the Supreme Court of Ohio accepted Williams's appeal, and ordered the parties to brief the case.  (Doc. No. 7-1, Exh. 21.)  Williams filed a Merit Brief on March 17, 2015, raising the same Propositions of Law set forth in his Memorandum in Support of Jurisdiction . (Doc. No. 7-1, Exh. 22.)

On November 4, 2015, the Supreme Court of Ohio dismissed Williams's appeal *sua sponte*, on the grounds it had been improvidently accepted.  (Doc. No. 7-1, Exh. 24.)

**E.     Federal Habeas Petition**

On November 2, 2016, Williams, through counsel, filed a Petition for Writ of Habeas Corpus and asserted the following grounds for relief:

**Ground One**:     Petitioner demonstrated good cause for late filing of his motion to re-open appeal.

**Supporting Facts**:     Petitioner was just 17 years old when he was arrested for this alleged crime.  He had no prior experience with the criminal justice system.  He has been in continuous custody since February 22, 2007.  He had no personal contact with his assigned appellate lawyer.  He was never

10

given a copy of his merit brief nor the State's merit brief. When his appeal was denied he was never notified of the result nor given a copy of the written decision.  His appellate lawyer never advised him on directly appealing to the Ohio Supreme Court nor moving to re-open the appeal.  Petitioner detrimentally relied upon appellate counsel to raise all issues and to properly advise him. Appellate counsel failed to do so.

**Ground Two**:  Ineffective assistance of appellate counsel for failing to raise the issue of ineffective assistance of counsel in failing to move for a mistrial.

**Supporting Facts**:  Trial counsel failed to move for a mistrial based upon the prosecutor's unfair, deliberate, and improper attack upon the defense alibi.  This attack had a devastating effect upon the defense theory and undermined the credibility of defense counsel.  Appellate counsel failed to raise this issue on direct appeal.

**Ground Three**:  Ineffective assistance of appellate counsel for failing to raise the issue of ineffective assistance of trial counsel in failing to file and litigate a motion to suppress evidence.

**Supporting Facts**:  Identification was the main issue in this case.  This crime happened on December 30, 2006, at about 6:30 pm and it was dark outside.  The gunman was wearing a hooded sweatshirt that covered his face.  This was a very shocking incident.  Prior to administering the photo line up, police showed one witness a single photo of Petitioner. The witness then made a pre-trial identification of Petitioner. A second witness was unable to identify Petitioner in a photo line up, but was permitted to make an in-court identification. Trial counsel made no attempt to challenge the pre-trial identification as being unreliable. Trial counsel made no attempt to challenge the in-court identification by the second witness.  Appellate counsel failed to raise this issue on direct appeal.

**Ground Four**:  Ineffective assistance of appellate counsel for failing to raise the issue of prosecutorial misconduct.

**Supporting Facts**:  The prosecutor was well aware that the theory of the defense case was alibi.  Although defense counsel did not

11

> file formal notice of alibi, the prosecutor waived any
> objection to the lack of written notice.  The prosecutor
> then proceeded to unfairly question the lead detective on
> whether he had investigated any defense alibi.  The
> detective responded that he had never been given notice of
> an alibi.  The prosecutor's purpose in asking the question
> was to attack the credibility of defense counsel, and to
> create the misimpression that the alibi was a sham.

(Doc. No. 1.)

Respondent filed a Motion to Dismiss the Petition as Time-Barred on January 30, 2017.

(Doc. No. 7.)  Williams filed a Response on February 13, 2017, to which Respondent replied on

February 21, 2017.  (Doc. Nos. 8, 9.)

### III. Law and Argument

**A.      Statute of Limitations**

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides a

one-year limitations period in a habeas action brought by a person in custody pursuant to the

judgment of a State court.  Under 28 U.S.C. § 2244(d)(1), the limitation period runs from the

latest of--

> (A) the date on which the judgment became final by the conclusion of direct
> review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State
> action in violation of the Constitution or laws of the United States is removed, if
> the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by
> the Supreme Court, if the right has been newly recognized by the Supreme Court
> and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented
> could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

12

**B.     One-Year Limitation**

Pursuant to § 2244(d)(1)(A), the AEDPA's one year period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  Here, Williams was sentenced on November 30, 2007 and timely appealed on December 28, 2007.  (Doc. No. 7-1, Exhs. 4, 5.) The state appellate court affirmed his conviction and sentence in a decision that was released on April 30, 2009 and journalized on May 11, 2009.  (Doc. No. 7-1, Exh. 8.)  Williams then had forty-five (45) days to appeal to the Supreme Court of Ohio, but failed to do so.  Based on this sequence of events, Respondent argues Williams's conviction and sentence became "final" for purposes of § 2244(d)(1)(A) on June 15, 2009, forty five (45) days after the state appellate court released its decision affirming his conviction and the time to file a timely notice of appeal with the Supreme Court of Ohio expired.  (Doc. No. 7 at 14.)  Respondent then asserts the limitations period commenced on June 16, 2009 and, absent tolling, would have expired one year later on June 16, 2010.  *Id.*

Williams does not challenge Respondent's assertion that § 2244(d)(1)(A) is the applicable provision or that his Petition is untimely thereunder.  (Doc. No. 8.)  In calculating the date Williams's conviction and sentence became "final" for statute of limitations purposes, however, neither party addresses the fact that, while the state appellate court decision was released on April 30, 2009, it was not journalized until May 11, 2009.  Giving Williams every possible benefit of the doubt, the Court will assume for purposes of this Report & Recommendation that Williams had forty-five (45) days from the date the state appellate court decision was *journalized*  (i.e., May 11, 2009) to appeal to the Supreme Court of Ohio.  Thus,

13

the Court finds Williams's conviction and sentence became "final" for purposes of §
2244(d)(1)(A) on June 25, 2009, forty five (45) days after the state appellate court journalized
its decision affirming his conviction and the time to file a timely notice of appeal with the
Supreme Court of Ohio expired.  Accordingly, the Court finds the limitations period
commenced on June 26, 2009 and, absent tolling, expired one year later on June 26, 2010.  *Id.*

However, as Respondent correctly notes, the AEDPA tolls the one-year limitations
period during the time "'a properly filed application for State postconviction or other collateral
review . . . is pending.' § 2244(d)(2)." *Evans v. Chavis*, 546 U.S. 189, 191, 126 S.Ct. 846, 163
L.Ed.2d 684 (2006); *Carey v. Saffold*, 536 U.S. 214, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002);
*accord Matthews v. Abramajtys*, 319 F.3d 780, 787 (6th Cir. 2003). "The time that an
application for state post-conviction review is 'pending' includes the period between (1) a lower
court's adverse determination, and (2) the prisoner's filing of a notice of appeal, provided that
the filing of the notice of appeal is timely under state law." *Id.*

Only "properly filed" applications for post-conviction relief or collateral review toll the
statute of limitations, and "a state post-conviction petition rejected by the state court as
untimely is not 'properly filed' within the meaning of § 2244(d)(2)." *Allen v. Siebert*, 552 U.S.
3, 128 S. Ct. 2, 169 L.Ed.2d 329 (2007); *Pace v. DiGuglielmo*, 544 U.S. 408, 125 S.Ct. 1807,
161 L.Ed.2d 669 (2005) ("time limits, no matter their form, are 'filing' conditions, and a state
postconviction petition is therefore not 'properly filed' if it was rejected by the state court as
untimely"); *Monroe v. Jackson*, 2009 WL 73905 at *2 (S.D. Ohio Jan. 8, 2009).  A timely filed
state post-conviction matter, however, cannot serve to toll a statute of limitations which has
already expired before the motion was filed.  *See Vroman v. Brigano*, 346 F.3d 598, 602 (6th

14

Cir. 2003). Section 2244(d)(2)'s tolling provision "does not ... 'revive' the limitations period (i.e., restart the clock at zero); it can only serve to pause a clock that has not yet fully run. Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations." *Vroman*, 346 F.3d at 602 (citation omitted). Further, if a state court ultimately denies a petition as untimely, that petition was neither properly filed nor pending and a petitioner would not be entitled to statutory tolling. *See Monroe* at *2; *Thorson v. Palmer*, 479 F.3d 643, 645 (9th Cir. 2007).

A review of the record shows Williams made no filings between May 11, 2009 (the date the state appellate court opinion was journalized) and June 26, 2010 (the date the AEPA statute of limitations expired.) Williams did file (1) *pro se* Motions to Stay the Imposition of Restitution, Fines and Costs, and to Vacate Fines and Court Costs, on June 6, 2013; and (2) a Motion for Leave to Reopen his Direct Appeal pursuant to Ohio App. R. 26(B) on May 29, 2014. (Doc. No. 7-1, Exhs. 9, 10, 12.) However, as noted above, state collateral review proceedings can no longer serve to avoid the statute of limitations bar once the limitations period is expired. *See Vroman*, 346 F.3d at 602. Because Williams's *pro se* post-conviction motions and 26(B) application were filed well after the statutory limitations period expired, they did not have any further tolling effect.

As the statutory limitations period expired on June 26, 2010 and Williams did not file his habeas petition until November 2, 2016, the Court finds the Petition is over six (6) years late and is untimely under § 2244(d)(1)(A). Therefore, unless equitable tolling is appropriate, Williams' Petition should be dismissed as time-barred.[1]

---

[1] Williams, who is represented by counsel in this action, does not argue that the limitations period should commence at a later date for any of the reasons set forth in §§

15

C.      **Equitable Tolling**

Although the Petition herein is untimely, the AEDPA statute of limitations period is also subject to equitable tolling.  *See Holland v. Florida*, 560 U.S. 631, 130 S.Ct. 2549, 2560, 177 L.Ed.2d 130 (2010).  Equitable tolling "allows courts to toll a statute of limitations when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control."  *Robertson v. Simpson*, 624 F.3d 781, 783 (6th Cir. 2010).  *See also Hall v. Warden, Lebanon Correctional Institution*, 662 F.3d 745, 749 (6th Cir. 2011).  However, the equitable tolling doctrine is granted by courts only "sparingly."  *See Robertson*, 624 F.3d at 784.  Moreover, "although 'the party asserting statute of limitations as an affirmative defense has the burden of demonstrating that the statute has run,' the petitioner bears the ultimate burden of persuading the court that he or she is entitled to equitable tolling." *Ata v. Scutt*, 662 F.3d 736, 741 (6th Cir.2011)(quoting *Griffin v. Rogers*, 308 F.3d 647, 653 (6th Cir. 2002)).

In order to be entitled to equitable tolling, a habeas petitioner must establish that (1) he has been pursuing his rights diligently; and, (2) some extraordinary circumstance stood in his way and prevented timely filing.  *Holland,* 130 S.Ct. at 2565.[2]  *See also Hall*, 662 F.3d at 749;

---

2244(d)(1)(B)-(D).

[2] In his Response, Williams argues he is entitled to equitable tolling under both the five factor test first set forth in *Dunlap v. United  States*, 250 F.3d 1001, 1008 (6th Cir. 2001) and the two part test set forth in *Holland.*  The Sixth Circuit, however, has made clear that "*Holland*'s two-part test has replaced *Dunlap*'s five-factor inquiry as the governing framework in this circuit for determining whether a habeas petitioner is entitled to equitable tolling."  *Hall*, 662 F.3d at 750 (citing *Robinson v. Easterling*, 424 Fed. Appx. 439, 442 n. 1 (6th Cir. 2011) (concluding that, in the wake of *Holland,* "requests for tolling under AEDPA are reviewed under a two-part test")).  *See also Keeling v. Warden, Lebanon Correctional Inst.*, 673 F.3d 452, fn 2 (6th Cir. 2012); *Kimbro v. Warden*, 2016 WL 768551 at * 4 (N.D. Ohio Jan. 15, 2016).  Thus, this Court examines Williams's

16

*Griffin*, 308 F.3d at 653.  "The diligence required for equitable tolling purposes is reasonable diligence, not maximum diligence."  *Holland*, 130 S.Ct. at 2565.  That being said, the Sixth Circuit has held that excessive delays in filing lack appropriate diligence.  *See e.g. Keeling v. Warden*, 673 F.3d 452, 463–64 (6th Cir. 2012); *Vroman*, 346 F.3d at 605 (stating that a court should be "much less forgiving ... where the claimant failed to exercise due diligence in preserving his legal rights"); *Henson v. Warden, London Correctional Inst*., 620 Fed. Appx. 417, 419 (6th Cir. 2015).

Here, Williams argues he is entitled to equitable tolling because he "never had any communication with appellate counsel concerning his direct appeal, nor was he given a copy of the decision denying his appeal."  (Doc. No. 8 at fn 2; Doc. No. 8-1.)  He further asserts he was unaware of his right to appeal the state appellate court decision to the Ohio Supreme Court.  (*Id*.)  Williams claims he "diligently pursued his rights both through filing a direct appeal, a motion to vacate fines and costs, a motion to re-open direct appeal, an appeal to the Ohio Supreme Court and the instant petition."  (Doc. No. 8 at 5.)  Finally, Williams maintains "the extraordinary circumstances of not [having] any contact with his first appellate lawyer, not being advised of the adverse appellate decision, nor of his right to appeal to the Ohio Supreme Court, not having any legal training or prior experience with the justice system, not having access to proper legal materials in prison, his limited education and tender age, certainly stood in Petitioner's way and prevented timely filing of this petition."  (*Id*. at 6.)

Respondent asserts Williams is not entitled to equitable tolling because he failed to diligently pursue his rights.  (Doc. No. 9 at 3.)  He notes Williams failed to file a motion for

request for equitable tolling under the two part test set forth in *Holland.*

17

leave to file a delayed direct appeal in the Ohio Supreme Court, and did not file his 26(B)

Application to Reopen his Appeal until over five years after his conviction was finalized.  (*Id.*)

Respondent also argues Williams has failed to demonstrate extraordinary circumstances

justifying equitable tolling, citing Sixth Circuit authority for the proposition that neither

insufficient legal advice nor lack of legal training justify the application of equitable tolling.

(*Id.* at 2-4.)

The Sixth Circuit has found that "[b]oth ineffective assistance of counsel and 'a

substantial, involuntary delay in learning about the status of their appeals' may constitute

extraordinary circumstances sufficient to warrant" equitable tolling.  *Keeling*, 673 F.3d at 462

(quoting *Robinson v. Easterling*, 2011 WL 1977272 at * 3 (6th Cir. May 20, 2011)).  However,

"petitioners who receive delayed notification of a state court judgment due to clerical or

attorney errors may not seek equitable tolling if they 'passively await decision.'"  *Robinson*,

2011 WL 1977272 at * 3 (quoting *Miller v. Collins*, 305 F.3d 491, 496 (6th Cir. 2002)).  Rather,

to obtain equitable tolling, a petitioner "must demonstrate that he exercised a reasonable

diligence in protecting his appellate rights."  *Id.*

In a case similar to the one at bar, the Sixth Circuit affirmed the district court's refusal to

equitably toll the statute of limitations, and summarized the law on this issue as follows:

> Keeling himself admits that he waited almost three years after the decision in his
> original appeal to the Ohio Court of Appeals before filing his first *pro se*
> post-conviction motion.  'While this Court has recognized that attorney
> assurances and the realities of incarceration may justifiably delay a petitioner's
> request for a case status update, ... this Court has never granted equitable tolling
> to a petitioner who sat on his rights for a year and a half.'  *Robinson*, 424
> Fed.Appx. at 443.  In *Robinson*, the petitioner requested case updates from his
> attorney, who failed to provide them, and the petitioner waited eighteen months
> between his last two update requests. *Id.* at 440–41, 443.  This court found that
> the petitioner failed to exercise the required diligence in pursuing his rights and

18

affirmed the district court decision declining to equitably toll the statute of limitations, even though the petitioner's attorney failed to inform him of the appellate decision for more than one year after it issued.  *Id*. at 440–43.  Further, we have declined to allow equitable tolling where a petitioner's attorney misled him into believing that his appeal was still pending before the state court because the petitioner failed to diligently monitor the progress of his appeal.  *Winkfield v. Bagley*, 66 Fed.Appx. 578, 583–84 (6th Cir. 2003).  Similarly, this court has declined to equitably toll the statute of limitations where a petitioner alleged that the state court and his attorney failed to inform him that a decision had been rendered affirming his conviction.  *Elliott v. Dewitt*, 10 Fed.Appx. 311, 312–13 (6th Cir. 2001).

Here, Keeling's delay exceeds that which has previously been found excessive and inappropriate for the application of equitable tolling.  *See Robinson*, 424 Fed.Appx. at 443.  Keeling did not diligently monitor the status of his appeal.  *See Winkfield*, 66 Fed.Appx. at 583–84; *Elliott*, 10 Fed.Appx. at 313.  Even after learning of the Court of Appeals's decision, Keeling did not diligently pursue his delayed appeal or file a timely federal habeas petition.  Despite Keeling's argument to the contrary, he has not acted with the sufficient diligence to warrant equitable tolling of the statute of limitations.

*Keeling*, 673 F.3d at 463–64 (emphasis added).

Like the petitioner in *Keeling*, above, the Court finds Williams failed to exercise reasonable diligence in either monitoring the status of his appeal or protecting his federal habeas rights.  Over five years elapsed between the state appellate court's dismissal of Williams's appeal (May 11, 2009) and the date he filed his 26(B) Application (May 29, 2014).  Although Williams asserts appellate counsel failed to communicate with him, Williams does not claim that he made any attempt to obtain information from his appellate counsel regarding the status of his appeal.  Nor does he offer any explanation for failing to monitor the status of his appeal through other means, such as direct contact with the state court clerks' office or legal research.  Moreover, while Williams asserts he did not become aware of the appellate court decision or his right to appeal until he hired new counsel in July 2014, he fails to offer any explanation as to why he waited until that late date to seek legal advice.  Finally, Williams also

19

fails to explain why he waited a year to file his habeas petition (on November 2, 2016) after his appeal from the denial of his 26(B) Application was dismissed (on November 4, 2015).

Thus, and for all the reasons set forth above, the Court finds Williams has failed to demonstrate he has been reasonably diligent in pursuing his rights.  *See e.g., Vroman*, 346 F.3d at 605 (finding petitioner's decision to proceed solely to the Ohio Supreme Court rather than filing his federal habeas petition and protecting his federal constitutional rights shows a lack of diligence); *Robinson*, 424 Fed. App'x at 442 ("[t]his Court has never granted equitable tolling to a petitioner who sat on his rights for a year and a half, and we decline to do so here"); *Dudley v. Clipper*, 2014 WL 6896080 at * 8-9 (N.D. Ohio Dec. 8, 2014).

The Court also rejects Williams's argument that his "tender age, limited education, lack of experience with the criminal justice system, [and] lack of legal training" constitute "extraordinary circumstances" warranting equitable tolling.  (Doc. No. 8 at 5.)  The Sixth Circuit has repeatedly held that "ignorance of the law alone is not sufficient to warrant equitable tolling."  *Rose v. Dole*, 945 F.2d 1331, 1335 (6th Cir. 1991).  *See Allen v. Yukins*, 366 F.3d 396, 403 (6th Cir. 2004); *Allen v. Bell*, 250 Fed. Appx. 713, 716 (6th Cir. 2007); *Taylor v. Palmer*, 623 Fed. Appx. 783, 789 (6th Cir. 2015).  *See also Johnson v. United States*, 544 U.S. 295, 311, 125 S.Ct. 1571, 161 L.Ed.2d 542 (2005) ("[w]e have never accepted *pro se* representation alone or procedural ignorance as an excuse for prolonged inattention when a statute's clear policy calls for promptness"); *Patrick v. Bunting*, 2015 WL 10488878 at * 9 (N.D. Ohio Dec. 29, 2015). Moreover, courts within this Circuit have found a petitioner's *pro se* status, lack of legal training, poor education, and/or limited law-library access, standing alone, are similarly insufficient.  *See e.g., Hall*, 662 F.3d at 751 (petitioner's *pro se* status, limited law-library

20

access and lack of access to trial transcript were not sufficient to warrant equitable tolling); *Keeling*, 673 F.3d at 464 ("Keeling's *pro se* status and lack of knowledge of the law are not sufficient to constitute an extraordinary circumstance and to excuse his late filing"); *Burden v. Bunting*, 2016 WL 5417834 at * 6 (N.D. Ohio July 15, 2016) ("Courts have uniformly held that neither a prisoner's *pro se* status nor his lack of knowledge of the law constitute extraordinary circumstances justifying equitable tolling"); *Johnson v. LaRose*, 2016 WL 5462635 at * 10 (N.D. Ohio July 8, 2016) ("A petitioner's *pro se* status and his unawareness of the law provide no basis for equitable tolling"). Accordingly, and under the circumstances presented, the Court finds Williams has failed to demonstrate his limited education and lack of legal training constitute extraordinary circumstances justifying equitable tolling.

In sum, because Williams failed to exercise his rights diligently and no extraordinary circumstance prevented him from filing the instant Petition, the Court finds equitable tolling is not warranted in this case.

**E.     Actual Innocence**

In *McQuiggin v. Perkins*, ⎯⎯ U.S. ⎯⎯, 133 S.Ct. 1924, 1928, 185 L.Ed.2d 1019 (2013), the United States Supreme Court held that actual innocence, if proven, may overcome the expiration of AEDPA's one-year statute of limitations. The Court noted that a claim of actual innocence is not a request for equitable tolling but, rather, a request for an equitable exception to § 2244(d)(1). *Id*. at 1931.

For the actual innocence exception to apply, a petitioner must "support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial."

*Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).  The Supreme Court

explained, however, that "tenable actual-innocence gateway pleas are rare" and "'[a] petitioner

does not meet the threshold requirement unless he persuades the district court that, in light of

the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a

reasonable doubt.'"  *McQuiggin*, 133 S.Ct. at 1928 (quoting *Schlup*, 513 U.S. at 329).  In

making this assessment, "'the timing of the [petition]' is a factor bearing on the 'reliability of

th[e] evidence' purporting to show actual innocence."  *Id*. (quoting *Schlup*, 513 U.S. at 332).

Here, Williams does not identify any new, reliable evidence of his actual innocence that

was not presented at trial.  Rather, he relies on a purported change in state law regarding

juvenile bind over proceedings, as follows:

> In this case, Petitioner was never given a full juvenile bind over hearing with
> testimony and the opportunity for cross examination.  Instead, this case was
> classified as a "mandatory bind over" case under R.C. 2152.12.  Recently, the
> Ohio Supreme Court struck down the mandatory bind over procedure.  *State v.
> Aalim*, Slip Opinion, 2016-Ohio-8278.  If Petitioner had been given the
> opportunity for a full and fair bind over hearing, he would have been able to
> challenge identification witnesses and establish actual innocence by
> demonstrating that he was wrongly identified by claimed eyewitnesses.

(Doc. No. 8 at 6-7.)

The Court finds Williams has not demonstrated he is entitled to the actual innocence

exception.  Williams' vague assertion that he "would have been able to challenge identification

witnesses" had he been given a bind over hearing is entirely insufficient to demonstrate actual

innocence under the standard set forth in *McQuiggin* and *Schlup, supra*.  Williams does not

specifically identify any new evidence in support of his claim of actual innocence, much less

new, reliable evidence demonstrating that "no juror, acting reasonably, would have voted to

find him guilty beyond a reasonable doubt."  *McQuiggin*, 133 S.Ct. at 1928.

22

Moreover, Williams cites no authority to support his argument that a change in state law regarding mandatory juvenile bind over proceedings is sufficient to satisfy the requirements for the actual innocence exception under *McQuiggin* and *Schlup, supra.*  Finally, even assuming such a change in state law was somehow relevant to this issue, Williams's argument nonetheless fails because the sole case upon which Williams relies (i.e., *State v. Aalim*, ---- N.E.3d----, 2016-Ohio-8278 (Ohio S.Ct. Dec. 22, 2016)) was recently reconsidered by the Supreme Court of Ohio, and the decision was vacated.  *State v. Aalim*, ---- N.E.3d -----, 2017-Ohio-2956 (Ohio S.Ct. May 25, 2017).

Accordingly, and for all the reasons set forth above, the Court finds Williams has not demonstrated he is entitled to the actual innocence exception.

### III. Conclusion

For the foregoing reasons, it is recommended the Court find that the instant Petition is time-barred under § 2244(d)(1).  It is further recommended Respondent's motion to dismiss (Doc. No. 7) be GRANTED and the Petition be DISMISSED.


    *s/ Jonathan D. Greenberg*
    Jonathan D. Greenberg
    United States Magistrate Judge

Date: June 14,  2017


### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

23